## Case No. 12,121.

RUGGLES et al. v SOUTHERN MINN. R. CO.

[5 Chi. Leg. News, 110; 17 Int. Rev. Rec. 29.]

Circuit Court, D. Minnesota. Nov. 7, 1872.

MORTGAGE—CONDITION—FAILURE TO PAY INTEREST—PRINCIPAL DUE—INSOLVENCY—APPOINTMENT OF RECEIVER.

1. The court does not agree with the opinion of Judge McLean, holding that a stipulation like the one contained in these mortgages, viz.: that on default in the payment of interest the principal shall become due "is a penalty, and a court of equity will relieve a party from such an unconscionable contract," but considers this opinion of such a contract contrary to the unbroken current of authorities for a long series of opinions in this country and in England.

2. The statutes of Minnesota do not forbid such an agreement as would give a right of entry and covenant to deliver possession.

3. The power is given to be used at the discretion of the trustees, and so stipulated, and it is not for this court to say that they have abused their discretion; they claim to act in commencing these proceedings under the powers in the mortgages, which give them the right to foreclose and sell all the franchises, income and estate of the road, to pay not only the interest but the principal of the secured debt, and this they can do without exhausting any other power given them in the contract.

4. In case of a mortgage of tolls and income a receiver is a common remedy, and if the earnings are being so applied as not to be legally applicable to reduce the incumbrance a receiver will be appointed. Inadequacy of security in

connection with insolvency is good ground for the interposition of the court, or where there is reason to believe that the complainant will not be in as good a position at the final decree as at present.

5. The court finds that the property of the company is not sufficient security for the payment of its indebtedness, and appoints a receiver.

[This was a bill of complaint by Samuel B. Ruggles and Albon P. Man, trustees, against the Southern Minnesota Railroad Company. Heard on motion for an injunction and the appointment of a receiver.]

H. J. Horn and Gilfillan & Williams, for complainants.

Bigelow, Flandrau & Clark, Gilman, Clough & Wilde, and Davis & O'Brien, for defendants.

NELSON, District Judge. This is an application for an injunction and the appointment of a receiver, made upon a bill of complaint and affidavits sustaining the allegations therein, filed by Samuel B. Ruggles and Albon P. Man, citizens of the state of New York, trustees, to foreclose certain mortgages executed to them by the Southern Minnesota Railroad Company in trust to secure the payment of its bonds. The bill includes as defendants certain persons who are alleged to be judgment creditors of the company. An order to show cause was served upon the company before the time to answer had expired. The company has presented several affidavits in response to the application, including one made by its president. The important facts to be considered at this time, as they appear from the bill and the evidence so far in the case, are these: The Southern Minnesota Railroad Co., created a body politic and corporation by the laws of the state of Minnesota to construct and operate a railroad from the Mississippi river to the western boundary of the state, negotiated bonds to the amount of four millions five hundred and ninety-two thousand dollars, in two classes. One class, to the amount of three million three hundred and forty thousand dollars, running by their terms about twenty years, with interest at the rate of eight per cent. per annum, payable semi-annually on the first day of April and October of each year; and the other class, to the amount of one million two hundred and fifty-two thousand dollars, by their terms running about twenty years with interest at the rate of seven per cent. per annum, payable semi-annually on the first day of January and July in each year; and to secure the payment of the same, executed two mortgages of the railroad and its equipments, and all the franchises and estate of the company, including the income earnings and profits of its road, in trust, for the bondholders.

The language used in both deeds is as follows: "All and singular the railroad of the said party of the first part, constructed or to be constructed, upon or over the line or route of their said road, running from the Mississippi river westward, through the southern tier of counties of Minnesota to the extent of one hundred and eighty miles, and also all the lands, tenements and hereditaments acquired and appropriated, or which shall hereafter be acquired and appropriated for the purpose of a right of way for the said railroad, to the extent last aforesaid and all the appurtenances thereunto belonging, with all the depots, engine-houses, car-houses, station-houses, warehouses, machine-shops, workshops, superstructures, erections and fixtures now belonging, or which may hereafter belong to the party of the first part, and the lands upon which the same are, or which may be acquired or appropriated therefor, so far as the said buildings, rights and other property shall be situated upon, or shall belong or pertain to the said one hundred and eighty miles of road; and also all the rails, bridges, ways, piers, depots, locomotives, tenders, passenger cars, freight cars and all other cars, carriages, chairs, spikes, wheels, axles, ties, tools, machinery and equipment for said railroad, to the extent last aforesaid, now owned, or which shall hereafter be owned or acquired by said party of the first part; and also all other goods and chattels now owned, or which shall hereafter be owned by the party of the first part, in any way relating or appertaining to, or connected with said railroad, or the running or operating of the same to the extent aforesaid, together with all rents, income, issues, profits, moneys, rights, benefits and advantages derived, or which may be derived in any way from the premises so conveyed, including also all the franchises and other rights of the party of the first part hereinbefore recited, and pertaining to the said one hundred and eighty miles of road, and all the lands which may be hereafter acquired by the party of the first part, or to which it shall be entitled, through or under any land grant or other act of the congress of the United States, or of the said state of Minnesota, for or in respect to the construction of said road to the extent of one hundred and fifty miles westward from the present terminus of said completed road at Rushford, thirty miles from the Mississippi river." The railroad was in course of construction at the time these bonds were issued, and the mortgages executed. and only a small portion of it, thirty miles as stated, finished and in operation. It was constructed almost entirely, with the exception of thirty miles, to its present terminus, one hundred and sixty-seven miles west of the river, by means of the funds raised from these bonds and stock created by the company. Both mortgages bear date on the 24th of September, 1867; and one of them, to secure the seven per cent bonds "is subject to the preference and priority of the other."

The complainants allege that these mortgages were executed and acknowledged sev-

eral months subsequent to the day they bear date; but the time, in my opinion, is not important upon this motion. The mortgages securing the payment of both issues of bonds contain a provision, that "in and by each of which bonds, as well as now by the present indenture, it is also provided that if the party of the first part shall, for the space of ninety days after demand, and tender of such interest warrants or coupons at the place or places where the same are payable as aforesaid, make default in the payment of the semiannual interest due or to become due upon any of said bonds, then the whole principal sum of each of said bonds shall immediately become due and payable, anything herein or in the said bonds to the contrary notwithstanding." And also that "in case the party of the first part shall fail to pay the principal or any part thereof, or any of the interest on any of the said bonds at any time when the same may become due and payable according to the tenor thereof, then after ninety days from such default, and upon the written request of the holders of any hundred of the said bonds, the parties of the second part, the survivors and successors of them may and they hereby are authorized and empowered to enter into and upon, and to take actual possession of all and singular the aforesaid railroad premises, franchises, rights, and property, real and personal, and effects hereby granted, conveyed, assigned, mortgaged, pledged, transferred and set over, or intended so to be, and (until sale thereof) by themselves or their agents or substitutes, to have, use and employ the same, and collect and receive the tolls, income and profits, receipts and earnings thereof, and of every part thereof, or to be devised therefrom, making from time to time in their full discretion, all needful repairs, alterations and additions thereto, and after deducting the expenses of such use, repairs, alterations and additions and their costs, charges and expenses, to apply the receipts, tolls, income, earnings and profits of said railroad and its appurtenances toward the payment of the interest and principal of all of said bonds remaining unpaid; and in such case, the agent or agents of said road, or roads, actually in possession thereof, are hereby ordered to give such possession to the parties of the second part, the survivor and successors of them. And on such default and after such lapse of time thereafter, as aforesaid, the parties of the second part, the survivor and successors of them may, and upon the written request of the holders of at least one-tenth in amount of the said bonds, or of such of them as shall have been actually and in good faith negotiated and issued and shall then remain unpaid, shall cause to be sold the said railroad, premises, franchises, rights and property, real and personal, of every character, hereby mortgaged as aforesaid, or so much thereof as shall be necessary to pay and discharge the principal

and interest of all such of the said bonds issued and negotiated as aforesaid as may then remain unpaid, at public auction." A default was made in the payment of the interest upon the eight per cent. bonds due the first day of April last, and also of the interest due upon the seven per cent. bonds on the first day of July last, and a demand was made by the trustees for the possession of the road, in accordance with the conditions of the mortgage securing the eight per cent. bonds, and refused by the company. The holders of one-tenth in amount of the bonds of each class have requested the trustees to foreclose the mortgages. In addition to the bonded indebtedness, it appears that a floating unsecured debt of eight hundred and twenty-five thousand dollars, including an estimate due for right of way, exists, and that it was incurred under the present management of the company, over five hundred thousand dollars of which is due the president individually; and further, that the present machine shops of the company have been erected upon land owned by the president, and were placed there by his direction.

The facts above related are undisputed, but the company in meeting the order to show cause denies its insolvency, which is charged in the bill, and sustaining affidavits, and also that its property is an inadequate security to the bondholders, and claims that the management of the road and its property has been prudent and careful, and such as received the commendation of the complainants. It is admitted that the net earnings of the road have not been sufficient to meet the accruing interest upon the bonds, and that they have been applied towards reducing and keeping down the floating indebtedness; but it is urged the company had a right to do this, and that the trustees should have provided the interest when the net earnings were not sufficient to pay it, by a sale of the lands of the company. A charge in the affidavits sustaining the bill, that the company has made a contract with its president and another officer for the transfer of its freight and passengers across the Mississippi river, while admitted by the president in his affidavit, and claimed to be not remunerative to him, appears from the books of the company to have absorbed nearly one-tenth of its gross receipts in operating its railroad for six months previous to the default in the payment of the July interest. The affidavit of the president is very long, and gives a history of the enterprise from its inception, the embarrassments that it has labored under, and the hopes and disappointments of its friends, and the machinations of its enemies. A large portion of it, in my opinion, relates to matters not necessary to be considered at this time.

The counsel for the company assail the mortgages, and claim that the provisions therein are unusual and extraordinary. If it should even be admitted that such was the

case, and our inquiry directed to the terms of the contract, it will be found that freed from the technical formality and verbiage of the conveyance, it is a plain and simple agreement, expressing unmistakably the intention of the parties thereto. The company on its part has agreed with the holders of the bonds represented by the complainants, that if they will furnish it with the money necessary to construct the road, it will give as security its franchises, railroad built and to be built, its equipments and the income and earnings therefrom, and all real estate to which the company may become entitled under its charter. And in order to carry out this agreement and intent, stipulates that in case of default in the payment of interest for a period of ninety days, the whole principal of the bonds outstanding at that time shall immediately become due and payable, and the bondholders may enter and take possession of the road and operate it by themselves, or their agents, and apply the net proceeds to the payment of the debt. The road, it is undisputed, has been built with the money obtained from the bondholders under this agreement, or rather, all the money that has been obtained from the sale of the bonds has been used in the construction of the road to its present terminus, one hundred and sixty-seven miles west from the Mississippi river.

Now I ask, will a court of equity forbid such a contract to be carried out? I am cited to an opinion in the note to Redf. R. R. (2d Ed.) p. 539, § 235, delivered by Mr. Justice McLean, holding that a stipulation like the one contained in these mortgages, viz., that on default in the payment of interest the principal shall become due, is "a penalty, and a court of equity will relieve a party from such an unconscionable contract." While under any circumstances I should dissent from the opinion of this eminent jurist with hesitation and distrust of the correctness of my judgment, I think it clear and well established, that the view entertained by him of such a contract is contrary to the unbroken current of authorities for a long series of years in this country and in England. 4 Taunt. 227; 5 Barn. & Adol. 40; Noyes v. Clark, 7 Paige, 179; [Pennock v. Coe] 23 How. [64 U. S.] 124; Penn v. Atlantic & G. W. R. Co., 11 Am. Law Reg. [U. S.] 576. An examination will sustain the assertion that such stipulations are not unusual—[Galveston R. Co. v. Cowdrey] 1 Wall. [78 U. S.] 66,—and when agreed to are valid and will be enforced by the courts.

But it is urged that the statutes of Minnesota forbid such an agreement as would give a right of entry and covenant to deliver possession. Rev. St. Minn. pp. 540, 565. I can find nothing therein which would make such a contract invalid, and know of no rule of law or principle of equity that would deny its effect. The only effect of the statutes above cited is to declare that the legal title is in a mortgagor of realty, and possession can be held by him until one year after a decree for the sale of the property. The law does not forbid a mortgagor from voluntarily consenting to a surrender of the mortgaged premises at any time. He may refuse to abide by his stipulations, but after condition broken the mortgagee has an equitable right which can be enforced, and such is the constant practice in the courts of those states where the mortgagee has the equitable right (Furbish v. Lears [Case No. 5,160]; [Boyce v. Grundy] 3 Pet. [28 U. S.] 210, 215; 2 Redf. R. R. (2d Ed.) § 225, note, p. 517); and even in some where the legal right of entry is with him (14 Ohio, 172). In that case it was held that "if the trustee did not see fit to act upon the power to take possession of the road, or sell it, he could apply for the ordinary remedy in cases of this character, which is to a court of equity, whose duty it would be through a receiver to see that the great objects of the work would be as little interfered with as the interests involved in the action would permit."

The claim that the trustees should have sold the lands granted by the state and the United States to the company, under a power given them in one of the mortgages, and thus have prevented a default, and the consequences resulting therefrom, is strongly and forcibly urged; but I can see nothing in connection with that power which would take it out of the general rule to be applied to any and all of the powers granted them. If any effect is to be given to the phraseology of the instrument, it would appear that the tolls, income, earnings and profits would create the primary fund out of which the interest should be paid and that the land subsidy should be used to create a sinking fund for the redemption of the bonds and payment of the principal, with authority in the trustees to sell such quantities of land on the best terms they can as would provide for the payment of any interest on the bonds, if in their judgment it shall be necessary. This power is given to be used at the discretion of the trustees, and so stipulated, and it is not for this court to say that they have abused their discretion. They claim to act in commencing these proceedings, under the power in the mortgages which gives them the right to foreclose and sell all of the franchises, income and estate of the road, including the land given as above stated, to pay not only the interest but the principal of the secured debt. This I think they can do without exhausting any other power given them in the contract.

I come now to the question whether a proper case has been made out to entitle the complainants to a receiver. In case of a mortgage of tolls and income, a receiver is a common remedy (Kerr, Rec. p. 49, § 4; Id. pp. 62–64, § 6); and if the earnings are being so

applied as not to be legally applicable to reduce the incumbrance, a receiver will be appointed (2 Redf. R. R. § 224). Inadequacy of security in connection with insolvency is good ground for the interposition of the court; or where there is reason to believe that the complainant will not be in as good a position at the final decree as at present. Kerr, Rec. pp. 8–10. I am not unmindful that the appointment of a receiver is a delicate exercise of authority, and a court should with hesitancy take property out of the possession of one having the legal estate. But courts have done it in proper cases, even where the relief sought was founded upon a disputed equity. 13 Ves. 105; Schenck v. Peay [Case No. 12,450]. The road and its appurtenances are not, in my opinion, adequate security for its indebtedness. The amount of its liabilities secured and unsecured, are five million five hundred and ninety thousand dollars, including the interest due last April and July, and the gross earnings for the six months prior to July are only two hundred and two thousand four hundred and five dollars. The road-bed and track are in fair condition, and the earnings since July have been increasing largely, but I am unable to resist the conclusion from all the facts in the case, placing the value of the road and equipments at a very high figure, and the unoccupied lands of the company at the value of lands in their neighborhood, that the property is still not sufficient security for the payment of its indebtedness.

Upon full consideration, therefore, of the case as presented, I have reluctantly come to the conclusion that the application must be granted. An order will be made for the appointment of a receiver, and an injunction against any interference by the company or its agents with him or the property. When served, the injunction will take the place of the preliminary restraining order made on the filing of the bill.